IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. MURPHY<br>906 NE 188th Street<br>Smithville, MO 64089<br><br>Plaintiff,<br><br>v.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY a/k/a LINCOLN NATIONAL CORPORATION, LINCOLN FINANCIAL GROUP<br>Serve: Registered Agent<br>Corporation Service Company<br>135 N. Pennsylvania Street – Suite 160<br>Indianapolis, IN 46204<br><br>and<br><br>OPENTEXT, INC. Individually and as duly Appointed Plan Administrator<br>Serve: Registered Agent<br>CSC-Lawyers Incorporating Service Company<br>221 Bolivar Street<br>Jefferson City, MO 65101<br><br>Defendants. | ) | Case No : |

# EXHIBIT D

Lincoln Financial Group®

The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68172-9688
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5707

00000208 LFPZ0RD1 00003129

July 27, 2022

James T. Thompson
Edelman & Thompson, Llc.
PENNTOWER OFFICE CENTER
3100 BROADWAY, SUITE 1400
KANSAS CITY, MO 64111

RE: Deceased: Robert Murphy
Policyholder: Opentext, Inc.
Policy #: SA3-840-444470-01
Claim #: 12375687

Dear James Thompson:

Please see enclosed correspondence regarding the appeal for Mr. Murphys claim.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lisa Macallister
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 16400
Secure Fax No.: (603) 334-5707

Attachments: 12375687-DENY-FREEFORM-07.25.2022

Lincoln Financial Group®

The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68172-9688
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5707

July 25, 2022

James T. Thompson
Edelman & Thompson, Llc.
PENNTOWER OFFICE CENTER
3100 BROADWAY, SUITE 1400
KANSAS CITY, MO 64111

00000208 LFPZ0RD1 00003131

RE: Deceased: Robert Murphy
Policyholder: Opentext, Inc.
Policy #: SA3-840-444470-01
Claim #: 12375687

Dear James Thompson:

We have completed our appeal review of the above-referenced claim for accidental death benefits under Group Life Insurance Policy #: SA3-840-444470-01 (hereinafter "Policy") issued by Lincoln National Life Insurance (hereinafter "Lincoln") to Opentext, Inc. Based on the facts of the case and the terms of the Policy, we have determined that Mr. Robert Murphy's death was not caused solely by an accident, independent of all other causes. As such, we agree with the underlying determination to deny accidental death benefits.

## Initial Claim Decision

Accidental death benefits were denied on the basis that Mr. Murphy's death was caused or contributed to by an intentionally self-inflicted injury, and his death was not accidental. The basis for the decision was outlined in a letter dated April 20, 2022. Your client was provided an opportunity to request an appeal review of the denial by submitting a written request stating the reasons why they felt that the claim should not have been denied and submitting additional information to support the claim.

## Appeal

We received your appeal request on behalf of Mr. Mike Murphy on June 16, 2022. No additional information was submitted with the letter.

## Appeal Evaluation

To ensure a full and fair review on appeal, we have reviewed the information in the file in its entirety and have considered all information, facts and circumstances pertaining to this claim.

**Records reviewed:**

- The March 18, 2022 Office of the Jackson County Medical Examiner, Report of the Medical Examiner.
- The March 4, 2022 AXIS, Testing Report.
- The March 21, 2022 State of Missouri Death Certification.

Robert Murphy was a 50-year-old male who was found deceased at his residence with numerous bottles of compressed air on January 13, 2022. The cause of death is reported as toxic effects of difluoroethane.

According to the Autopsy report, Mr. Murphy died as the result of a Toxic effects of difluoroethane and had a medical history of hypertensive cardiovascular disease and obesity.

The toxicology report indicated Mr. Murphy's femoral blood was positive for volatiles, acetone and difluoroethane. His urine was screened and positive for Amphetamines and Methamphetamines.

The State of Missouri Death Certification for Robert Arthur Murphy, JR was issued on March 21, 2022. The date of death was listed as January 13, 2022. The cause of death is listed as: toxic effects of difluoroethane.

During the claim evaluation, the documentation on file was reviewed by a consulting physician who is board certified in internal medicine. In his report, he noted:

*1. On January 13, 2022 Robert Murphy was found deceased at his residence of toxic effects of difluoroethane abuse. According to investigator reports numerous bottles of compressed "air" were found at the residence. A postmortem femoral blood sample revealed a difluoroethane level known to be associated with fatalities. The autopsy revealed no alternative cause of death.*
*2. Based on the documentation received no other conditions or diseases caused or contributed to the death.*
*3. Difluoroethane is not a controlled substance rather it is readily available in keyboard cleaners such as Dust-off. Urine amphetamine, methamphetamine screening was positive but no confirmatory testing was performed therefore it is not possible to assess whether these substances were in fact present and if so whether they contributed to the death.*
*4. Difluoroethane is a volatile substance which is not available by prescription and has no medical indication for use. Mr. Murphy's postmortem difluoroethane level was within a range known to cause fatalities among inhalant abusers.*
*5. Symptoms of inhalant abuse are similar to alcohol intoxication: initial euphoria and disinhibition followed by central nervous system depression, the possibility of seizures, cardiac arrhythmia and sudden death. Cardiac arrhythmias are the most common cause of death in difluoroethane abusers. Based on product labeling Mr. Murphy would have known of the potential health risks associated with inhaling difluoroethane.*

*Robert Murphy was a 50-year-old male who was found deceased at his residence with numerous bottles of compressed air on January 13, 2022. The cause of death is reported as*

00000208 LFPZ0RD1 00003132

*toxic effects of difluoroethane (Freon 152a).*
*Past medical history:*

- *Hypertension*
- *Obesity 5'7", 238 pounds*

***Medical examiner report***
*According to investigator reports, the decedent was a 50-year-old white male with a medical history of hypertensive cardiovascular disease who was found at his residence with numerous bottles of compressed air.*
*Pathologic diagnosis*
*I. Toxic effects of difluoroethane*
*II. Hypertensive cardiovascular disease*
*III. Obesity*

00000208 LFPZ0RD1 00003133

*Microscopic findings – heart myocyte hypertrophy, edema fluid in the alveoli, rare sclerotic glomeruli.*

*Cause of death – toxic effects of difluoroethane*

***Toxicology***
*Femoral blood*
*Acetone 0.61 mg/dL*
*1,1-difluoroethane (DFE)* >54 mcg/mL*
**Axis forensic toxicology report indicates 1,1-difluoroethane (DFE) is a colorless and essentially odorless gas that is used as a non—ozone-depleting propellant found in many consumer products, electronic cleaners, and as a refrigerant and chemical intermediate. DFE inhalation can cause euphoria, disorientation and altered mental state. Due to its volatility and rapid elimination of this compound, the measured concentration may be lower than the concentration present at the time a specimen collection.*

*Urine*
*Amphetamine, methamphetamine qualitatively positive*

***Death certificate***
*Date of death – January 13, 2022*
*Cause of death – Toxic effects of difluoroethane*

As noted by the Medical Examiner, Difluoroethane caused or contributed to the death of Mr. Murphy. He also had hypertensive cardiovascular disease and obesity.

In your appeal letter, you argued that there was no evidence to support that Mr. Murphy subjectively "intentionally self-inflicted" harm via his inhalation of difluoroethane or objectively should have reasonably expected that serious bodily injury or death would be caused by inhaling the same.

You indicated there was no evidence of his personal characteristics and experiences, that he had suicidal thoughts, made any statement or had a history of suicidal thoughts or attempts.

You indicated the denial letter was devoid of potential past uses or experiences with compressed

"air". You argued the investigators referenced numerous bottles of compressed air found at his residence however they did not state whether they were empty or full. If they were full, that could indicate a lack of experience engaging in this activity. If the bottles were used, that would suggest Mr. Murphy had done this before without consequences.

You confirmed that no argument could be made that Mr. Murphy did not intentionally ingest the inhalant, however it was not his goal to overdose on difluoroethane. You also confirmed Mr. Murphy intentionally engaged in a risky activity. You did not offer any explanation to support he did not intentionally inhale difluoroethane and there is no reasonable or medical reason to do such.

During the review of the appeal, Mr. Murphy's claim was reviewed by a consulting physician who is board certified in Internal Medicine and Preventive Medicine (Occupational Medicine). In her report, she noted:

00000208 LFPZ0RD1 00003134

> *Per the Autopsy Report, the decedent had a medical history of hypertensive cardiovascular disease. He was found at his residence with numerous bottles of compressed air. Autopsy revealed an enlarged heart (500 g) and myocyte hypertrophy as well as pulmonary edema. The decedent's femoral blood underwent toxicology testing. This revealed acetone and 1,1-difluoroethane. The acetone concentration would not have been expected to cause any side effects. The 1,1-difluoroethane concentration was in the range associated with fatalities. Inhalation of 1,1-difluoroethane causes cardiac arrhythmias. The decedent had cardiomegaly and myocyte hypertrophy. Cardiomegaly/cardiac enlargement, whether hypertrophic or dilated, is an independent risk factor for cardiac arrhythmias and sudden cardiac death. Sudden cardiac death is not the same as a heart attack. Sudden death is a condition in which the heart suddenly and unexpectedly stops beating. This usually results in death within minutes if not treated. The cardiac arrest is usually due to an arrhythmia. Pulmonary edema was*
> *also found on autopsy, this is consistent with sudden cardiac death. The decedent's underlying heart disease may have increased his sensitivity to the cardiotoxic effects of 1,1-difluoroethane. Organic heart disease may have caused or contributed to the death of Mr. Murphy.*
>
> *Volatiles are substances which evaporate when exposed to air. Inhalants are volatile substances that produce chemical vapors that can be inhaled to induce a psychoactive, or mind-altering, effect. Confirmatory testing revealed the volatile inhalants Acetone and 1,1-difluoroethane in the blood of the decedent. See Assessment Section below for additional information.*
>
> *Acetone: Femoral Blood from the decedent underwent testing and revealed acetone (a volatile inhalant) at a concentration 0.61 mg/dL. Acetone is not a DEA Controlled Substance. Acetone and other ketones are produced when the cells do not get enough glucose. Acetone at this concentration found in the blood of the decedent is just above normal but may be seen in early diabetic ketoacidosis, malnutrition, eating disorders and in individuals on ketogenic diets. At the concentration found in the blood of the decedent, acetone would not be expected to produce any adverse effects.*
>
> *Amphetamines - Amphetamine/Methamphetamine: The decedent's urine was screened for basic drugs of abuse and was positive for amphetamines including the amphetamine and*

*methamphetamine. Amphetamine and methamphetamine are DEA Schedule II Controlled Substances. Confirmatory testing was not performed. The decedent's femoral blood was screened for drugs of abuse and was negative for amphetamines as well as other drugs of abuse. Since confirmatory/quantitative testing was not performed on the decedent's urine and his blood was negative for amphetamines, no further statement can be made regarding the presence of amphetamines in his urine.*

*1,1-Difluoroethane: Blood from the decedent was tested and revealed 1,1-difluoroethane. 1,1- difluoroethane is not a DEA Controlled Substance and is not considered a medication. Inhaling 1,1- difluoroethane induces euphoria and central nervous system depression (headache, confusion, incoordination, loss of consciousness). It can irritate the nose and throat causing coughing and wheezing. It also causes angioedema, malignant ventricular arrhythmias, pulmonary edema, respiratory depression, and sudden death. Displacement of oxygen from air causes hypoxemia. The concentration of 1,1-difluoroethane is consistent with concentrations associated with fatalities from 1,1 difluoroethane.*

*The autopsy revealed that the decedent had cardiomegaly (enlarged heart); his heart weighed 500 grams and microscopic examination reveal myocyte hypertrophy. Cardiomegaly/cardiac enlargement, whether hypertrophic or dilated, is an independent risk factor for cardiac arrhythmias and sudden cardiac death. Sudden cardiac death is not the same as a heart attack. Sudden death is a condition in which the heart suddenly and unexpectedly stops beating. This usually results in death within minutes if not treated. The cardiac arrest is usually due to an arrhythmia. Pulmonary edema was also found on autopsy, this is consistent with sudden cardiac death. The decedent's underlying heart disease may have increased his sensitivity to the cardiotoxic effects of 1,1-difluoroethane. Organic heart disease may have caused or contributed to the death of Mr. Murphy.*

*There is no valid reason or medical indication for the inhalation of 1,1-difluoroethane.*

At the outset, we disagree with your assertion that there was no evidence to support that Mr. Murphy subjectively "intentionally self-inflicted" harm via his inhalation of difluoroethane or objectively should have reasonably expected that serious bodily injury or death would be caused by inhaling the same. There is no acceptable reason to inhale compressed air and there are warning labels on the bottles to prevent such things.

You indicated there was no evidence of Mr. Murphy's personal characteristics and experiences, that he had suicidal thoughts, made any statement, or had a history of suicidal thoughts or attempts. Mr. Murphy had several recent claims for admissions into treatment centers for mental health issues and non-psychoactive substance abuse.

You confirmed that no argument could be made that Mr. Murphy did not intentionally ingest the inhalant, however it was not his goal to overdose on difluoroethane. You did not offer any explanation to support he did not intentionally inhale difluoroethane other than he knowingly and intentionally engaged in risky behavior.

Even if we accept that Mr. Murphy did not intend to commit suicide, the denial was based on intentionally self-inflicted injuries, while sane or insane. The fact remains that a reasonable person in Mr. Murphy's position would have viewed serious bodily injury or death as highly likely to occur

00000208 LFPZ0RD1 00003135

even if the intention was not suicide.

In addition, Mr. Murphy had history of hypertensive cardiovascular disease, and his urine was positive for Amphetamine and methamphetamine.

Accidental Death and Dismemberment benefits are payable under the Policy only when a covered employee suffers a loss solely as the result of an accidental injury that occurs while covered. *See* Policy, Section 4. The Policy defines "Injury" to mean "bodily impairment resulting directly from an accident and independently of all other causes. *See* Policy, Section 2." The term "accident" is not defined. To determine whether loss is accidental, in this case, it is necessary to review this matter under the federal common law under ERISA.

The federal common law has developed a two-part test to determine whether a death is accidental. If it is determined the injured person did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the injured person's expectations were reasonable. The pertinent inquiry is whether a reasonable person, with background and characteristics similar to the injured person, would have viewed the injury as highly likely to occur as a result of the injured person's intentional conduct.

00000208 LFPZ0RD1 00003136

Even if Mr. Murphy did not expect serious bodily injury or death to occur, such expectations were objectively unreasonable, since a reasonable person in Mr. Murphy's position would have viewed serious bodily injury or death as highly likely to occur. A reasonable person would, at a minimum follow the guidelines on the bottle and/or research the product. A reasonable person would not inhale a product not deemed fit for human consumption. In addition, Mr. Murphy's history of hypertensive cardiovascular disease would be considered an exclusion under exclusion #6 (disease, bodily or mental illness (or medical or surgical treatment thereof).

As such, we have determined Mr. Murphy's death was not solely the result of an accidental injury and no accidental death benefits are payable under the Policy.

## Conclusion

We conducted a thorough and independent review of the entire claim. Based on the facts of the case and the terms of the Policy, we have determined the accidental death benefit is not payable.

## The Policy

The Opentext, Inc.'s Group Life Insurance Policy states, in part:

> ***Benefits***
> *Accidental Death and Dismemberment benefits are payable when a Covered Person suffers a loss solely as the result of accidental Injury that occurs while covered...*
>
> *"**Injury**" means bodily impairment resulting directly from an accident and independently of all other causes.*
>
> *ACCIDENTAL DEATH AND DISMEMBERMENT EXCLUSIONS*

*No benefits are payable for any loss that is contributed to or caused by:*
*1. war, declared or undeclared, or any act of war;*
*2. intentionally self-inflicted injuries, while sane or insane;*
*3. suicide, or suicide attempt, while sane or insane;*
*4. active Participation in a Riot;*
*5. committing or attempting to commit a felony or misdemeanor;*
*6. disease, bodily or mental illness (or medical or surgical treatment thereof);*
*7. infections, except septic infections of and through a visible wound;*
*8. controlled substances (as defined in Title II of the Comprehensive Drug Abuse Prevention And Control Act of 1970 and all amendments) that are voluntarily taken, ingested or injected, unless as prescribed or administered by a Physician;*
*9. serving full-time active duty in the Armed Forces of any country or international authority;*
*10. boarding, leaving or being in or on any kind of aircraft. However, this exclusion will not apply if the Covered Person is a fare paying passenger on a commercial aircraft or traveling as a passenger in any aircraft that is owned or leased by or on behalf of the Sponsor; or*
*11. the presence of alcohol in the Covered Person's blood which raises a presumption that the Covered Person was under the influence of alcohol and contributed to the cause of the accident. The blood alcohol level is governed by the jurisdiction of the state in which the accident occurred; or*
*12. hazardous sports, including but not limited to, motor sports (land or water), mountain climbing, skydiving, parachuting, bungee jumping, hang gliding and scuba diving.*
*No benefit will be payable for any loss suffered as a result of Accidental Injury during any period of incarceration.*

This claim decision reflects an evaluation of the claim facts and Policy provisions.

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, you were entitled to appeal the decision made by Lincoln, and to submit any additional information you wished to be considered as part of the appeal. Lincoln has conducted a full and fair review of this appeal and we have determined that the denial of benefits will be maintained. At this time, the appeal process has been exhausted and no further review will be conducted by Lincoln.

You may request to receive, free of charge, copies of all documents relevant to your claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Lincoln Financial Group of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln Financial Group are based on the provisions outlined in Opentext, Inc.'s Policy. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

00000208 LFPZ0RD1 00003137

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or the state insurance regulatory agency. In addition, once all required reviews of this claim have been completed, you have the right to bring a civil action under applicable law. This employer's plan has a contractual limitations period of one year, which means that a lawsuit must be brought within one years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is July 25, 2023.

If you require language translation assistance, please contact Lincoln Financial Group to initiate a service provided free of charge to assist with understanding this claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shìì ata' hane'go shíká a'doowoł nínízingo saad hosiniilį́į' dóó ná'ookąąh nííníł'ąągo naaltsoos níinííłtsoozígíí hazhǫ'ó bik'idi'deeshtį́į́ł nínízingo doo bąąh ílínígóó níká a'doowoł éí bíníiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Lisa Macallister
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 16400
Secure Fax No.: (603) 334-5707

00000208 LFPZ0RD1 00003138 E